FILED

2010 Feb-23  AM 10:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

QBE INSURANCE CORPORATION, )

    PLAINTIFF,             )

VS.                          )          2:09-cv-170-JHH

EMC PROPERTY & CASUALTY    )
COMPANY,

                                   )

    DEFENDANT.

## MEMORANDUM OPINION

The court has before it the December 4, 2009 motion (Doc. #15) of Defendant EMC Property & Casualty Company ("EMC") for summary judgment, as well as the December 29, 2009 cross motion (Doc. #19) of Plaintiff QBE Insurance Corporation ("QBE") for summary judgment .  Pursuant to the court's orders of December 7 (Doc. #17) and 15, 2009, the motion for summary judgment (Doc. #15) was deemed submitted, without oral argument, as of January 15, 2010.  Pursuant to the court's order of January 6, 2010 (Doc. #21), the cross motion for summary judgment (Doc. #19) was deemed submitted, without oral argument, as of February 3, 2010.

1

# I.    PROCEDURAL HISTORY

Plaintiff QBE Insurance Company commenced this action on January 29, 2009 by filing a complaint (Doc. #1) for declaratory judgment in this court, seeking a determination that the EMC Homeowner's Policy issued to Jimmie L. Brown ("Brown") affords primary coverage to Brown in the underlying lawsuit, Civil Action No. CV-07-170, styled *Michael Walker, as Parent and Next Friend of Peyton Walker, a minor; Darrell Walker, as Parent and Next Friend of Jacob Walker; a minor v. Jimmie Lee Brown, Jr., an individual; and Allgreen Landscaping and Lawn Care, Inc., an Alabama corporation*.   QBE seeks to have EMC reimburse QBE in the amount of $302,813.93 or extend policy limits to QBE if those limits are less.[1]   (*See* Compl. at 1-2).

Defendant EMC's Motion for Summary Judgment (Doc. #15) asserts that no genuine issue of material fact exists and that EMC is entitled to judgment as a matter of law on the pending insurance coverage issues.   EMC requests this court grant it summary judgment and find that it owed no duties to Brown in the underlying action and owes no obligation to QBE for its payment to settle the underlying action.   (*See* Doc. #15 at 3).   Plaintiff QBE's Cross Motion for Summary Judgment (Doc. #19)

---

[1] Interestingly, the declaratory judgment complaint does not seek an alternative determination from this court that EMC may be liable for some contribution amount to the settlement.   That failure does not affect the court's opinion and order hereafter discussed.

asserts that QBE is entitled to summary judgment and that EMC has a duty to reimburse QBE for the defense and indemnification of *both* Brown and Allgreen Landscaping and Lawn Care, Inc. in the underlying lawsuit.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the motion for summary judgment (Doc. #15) and the cross motion for summary judgment (Doc. #19).  On December 4, 2009, Defendant EMC submitted evidence[2] (Doc. #16, exhs. 1-13) in support of the motion for summary judgment and also filed a supporting brief (Doc. #16).  Plaintiff QBE filed an opposition brief and cross motion for summary judgment (Doc. #19) on December 29, 2009 and on the same date filed evidence[3] (Doc. #20, exhs. A -L) in support of the opposition and cross motion.  On January 15, 2010 EMC filed a reply brief (Doc.

---

[2] Defendant EMC submitted: the complaint in the underlying action (Exhibit 1); the deposition of Jimmie Lee Brown, Jr. (Exhibit 2); the deposition of Peyton Walker (Exhibit 3); the deposition of Jacob Walker (Exhibit 4); the deposition of Michael E. Walker (Exhibit 5); the deposition of Darrell Walker (Exhibit 6); the deposition of William E. Barrett, Jr. (Exhibit 7); a true and correct copy of Policy 66S 44 60-06 with attachments (Exhibit 8); correspondence from EMC to Brown dated October 6, 2008 (Exhibit 9); QBE Insurance Commercial Lines Policy (Exhibit 10); correspondence (Exhibit 11); email from Billy Barrett to Ben DiGiorgio dated July 21, 2008 (Exhibit 12); Release from underlying action (Exhibit 13).

[3] Plaintiff QBE submitted: the deposition of Jimmie Lee Brown, Jr. (Exhibit A); the deposition of William E. Barrett, Jr. (Exhibit B); the Final Order in the underlying action (Exhibit C); QBE Insurance Commercial Lines Policy (Exhibit D); a true and correct copy of Policy 66S 44 60-06 with attachments (Exhibit E); the deposition of Ken Bernard (Exhibit F); Release from underlying action (Exhibit G); the complaint in the underlying action (Exhibit H); the deposition of Jacob Walker (Exhibit I); the deposition of Peyton Walker (Exhibit J); handwritten note (Exhibit K); Endorsement (Exhibit L).

#22) in further support of the original motion for summary judgment, and on January 27, 2010, EMC filed an opposition brief (Doc. #23) to QBE's cross motion for summary judgment.  Finally, on February 2, 2010, QBE filed a reply brief (Doc. #27) in further support of the cross motion for summary judgment.

## II.   STANDARDS FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

4

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer

6

rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   RELEVANT UNDISPUTED FACTS[4]

### A.   The Underlying Lawsuit

This declaratory judgment action arises out of a lawsuit filed on June 14, 2007 in the Circuit Court of St. Clair County, Alabama, styled *Michael Walker, et al. v. Brown and Allgreen Landscaping and Lawn Care, Inc.*, docket number CV 07-170. (*See* Doc. #16, Exh. 1).  According to the complaint in that underlying lawsuit, Michael Walker, as parent and next friend of his minor child, Peyton Walker, and Darrell Walker, as parent and next friend of his minor child, Jacob Walker (collectively "the Walkers" or "underlying plaintiffs") sought damages regarding an alleged imprisonment on December 11, 2005 at Allgreen Landscaping and Lawn Care, Inc. ("Allgreen" and/or "the business") in Pell City.  (*See* Doc. #16, Exh. 1). Specifically, the Walkers asserted in the underlying lawsuit that on December 11, 2005 Brown unlawfully detained the children against their will and imprisoned them

---

[4] It is notable that, as each party to this action has filed a motion for summary judgment, each avers that there are no genuine issues of material fact.  (*See* Doc. #15 at 1; *see also* Docs. #19, 20).

by restraining and depriving them of their liberty for approximately one hour without

any legal authority.[5]  (*See* Doc. #16, Exh. 1 at ¶¶ 5, 14, 19).  It is also alleged in the

underlying lawsuit that Brown assaulted the minor children by grabbing them by the

---

[5] "That on or about December 11, 2005, at approximately 6:00 p.m., at the business of ALLGREEN LANDSCAPING AND LAWN CARE, INC., located at 1155 Walkers Crossing Road in the City of Pell City, St. Clair County, Alabama, Defendants' did unlawfully detain the Plaintiffs against the Plaintiffs' will and imprisoned the Plaintiffs under the following conditions: restrained and deprived Plaintiffs' of their liberty, against the minor children's will, for approximately one hour without any legal authority to do so, by forcing the minor children to enter the business, and in a loud and threatening voice, and with vile and abusive language and physical aggressiveness, refused to allow the minor children to leave, even after being advised to do so by numerous law enforcement agencies.  As a direct result of Defendants' conduct, statements, and threats, the minor children were placed in apprehension of immediate harmful contact and thereby caused to submit, against their will, to the imprisonment and to the demands and conditions imposed by Defendants."  (Doc. #16, Exh. 1 at ¶ 5).

"On  December 11, 2005, at approximately 6:00 p.m., at the business of ALLGREEN LANDSCAPING AND LAWN CARE, INC., located at 1155 Walkers Crossing Road in the City of Pell City, St. Clair County, Alabama, Defendants intentionally and recklessly caused Plaintiffs to suffer emotional distress by unlawfully, forcibly, and maliciously imprisoning and restraining and depriving Plaintiffs of their liberty, against the minor children's will, for approximately one hour without any legal authority to do so, by forcing the minor children to enter the business, and in a loud and threatening voice, and with vile and abusive language and physical aggressiveness, refused to allow the minor children to leave, even after being advised to do so by numerous law enforcement agencies and while hearing the parents of the minor children calling their names frantically, and over and above the request of the minor children to leave."  (Doc. #16, Exh. 1 at ¶ 14).

"On  December 11, 2005, at approximately 6:00 p.m., at the business of ALLGREEN LANDSCAPING AND LAWN CARE, INC., located at 1155 Walkers Crossing Road in the City of Pell City, St. Clair County, Alabama, Defendants unlawfully, forcibly, and maliciously imprisoned and restrained and deprived Plaintiffs of their liberty, against the minor children's will, for approximately one hour without any legal authority to do so, by forcing the minor children to enter the business, and in a loud and threatening voice, negligently and wantonly accused the minor children of vandalism, and with vile and abusive language and physical aggressiveness, refused to allow the minor children to leave, even after being advised to do so by numerous law enforcement agencies and while hearing the parents of the minor children calling their names frantically, and over and above the request of the minor children to leave."  (Doc. #16, Exh. 1 at ¶ 19).

back of the neck, scratching and injuring them while forcing them into the business. (*See* Doc. #16, Exh. 1 at ¶ 9).  As a result of these alleged actions, the Walkers asserted the following causes of action against Brown, individually, and against the business: false imprisonment, assault, intentional infliction of emotional distress, and negligence and wantonness.  (*See* Doc. #16, Exh. 1 at Counts I-IV).

Prior to the incident giving rise to the underlying lawsuit, the Walker family owned acres of land in Pell City and numerous family members lived on the property. (*See* Doc. #16, Exh. 5 at 12, 16-20).  In 2005, Brown purchased 21 or 22 acres of the Walker family property from Michael Walker's aunt for the purpose of adding to his landscaping and nursery business.[6]  (*See* Doc. #16, Exh. 5 at 19-20 and Exh. 2 at 13). The portion of property purchased by Brown is adjacent to property owned by the extended Walker family and it is land locked by the Walker family land.  (*See* Doc. #16, Exh. 5 at 19-20).

In the fall of 2005, Brown noticed that his business trucks were being damaged by golf balls.  (*See* Doc. #16, Exh. 2 at 21-27).  In fact, after constructing the building for the landscaping and nursery business Brown noticed a group of boys hitting golf balls towards his nursery building and the trucks parked nearby.  (*See* Doc. #16, Exh.

---

[6] Brown's business and home are two separate locations in two separate counties.  (*See* Doc. #16, Exh. 2 at 6, 13).

2 at 21-27).  Brown believed that Peyton and/or Jacob Walker were some of the boys in the group that hit golf balls and damaged his business trucks.  (*See* Doc. #16, Exh. 2 at 21-27).  Although Brown discussed the matter with the fathers of Peyton and Jacob, Brown believed that the Walkers dismissed the matter and did not properly address it.  (*See* Doc. #16, Exh. 2 at 34, 66-68; *see also* Doc. #16, Exh. 5 at 24-29, 36 and Exh. 6 at 14-16).

On or about December 11, 2005, around 5:45 in the evening, Brown saw the two minors, Peyton and Jacob, on his business property.  (*See* Doc. #16, Exh. 2 at 50).  Brown claims he asked the boys to come into his office building, while the boys assert that Brown grabbed Peyton by his shirt and pushed Jacob inside the business office.  (*See* Doc. #16, Exh. 2 at 53; *see also* Doc. #16, Exh. 3 at 22 and Exh. 4 at 16-17).  Peyton testified that Brown scraped his back in the process of grabbing him and pushing him into the office.  (*See* Doc. #16, Exh. 2 at 13).  Jacob testified that the boys told Brown that they wanted to go home, however Brown kept on pushing them toward the business office door.  (*See* Doc. #16, Exh. 4 at 17).  Once inside the office, Brown asked the boys about the location of their parents and then called 911.  (*See* Doc. #16, Exh. 2 at 53).  The 911 deputy instructed Brown to immediately release the children, and Brown's daughter, a police officer, instructed Brown the same way.  (*See* Doc. #16, Exh. 2 at 57-58).  But Brown refused to release the children and

prevented them from leaving until the deputy arrived. (*See* Doc. #16, Exh. 2 at 50-53, 66-68). Brown states that he held the boys for their own safety because it was dark, there was a retaining pond on the property, and electrical and tripping hazards as well. (*See* Doc. #20, Exh. A at 60-62, 70-73). During the detention, Brown asked the boys if they had hit any golf balls onto the business property. (*See* Doc. #16, Exh. 3 at 26; *see also* Doc. #20 at 3-4, ¶ 29).

Peyton, the younger boy, cried almost the entire time he was detained and was shaking and delirious when his father found him. (*See* Doc. #16, Exh. 2 at 59; Exh. 4 at 20-22, Exh. 5 at 66). Both boys were physically upset when their fathers found them. (*See* Doc. #16, Exh. 4 at 24; Exh. 5 at 66; Exh. 6 at 19).

**B.    The Competing Insurance Policies**

EMC issued EMC Homeowners Policy Number 66S-44-60-06 to Jimmie L. Brown and Sheila Y. Brown with effective dates May 25, 2005 to May 25, 2006. (*See* Doc. #16, Exh. 8, "Homeowner's Policy"). On October 6, 2008, EMC sent a letter to Brown informing him that the company had investigated the claims asserted in the underlying complaint and that EMC determined that there was no personal liability coverage available to Brown under the Homeowner's Policy. (*See* Doc. #16, Exh. 9).

11

QBE issued a CGL (commercial general liability) policy to Allgreen for the policy period from July 22, 2005 to July 22, 2006. (*See* Doc. #16, Exh. 7 at 67-68; *see also* Doc. #20, Exh. D). The only named insured under the CGL policy is Allgreen Landscaping. (*See* Doc. #20, Exh. D, no. 910). However, the Policy also provides that the executive officers, directors, and stockholders of Allgreen are insured with respect to their liability as executive officers, directors, and stockholders of Allgreen Landscaping.[7] (*See* Doc. #20, Exh. D, no. 969).

QBE provided the defense to Allgreen and to Brown, without reserving its rights as to the issue of whether Brown was an insured under the QBE policy, in any of the three reservation of rights letters sent in the underlying action.[8] (*See* Doc. #16, Exh. 7 at 35-42, 67-68; Exh. 11). QBE contends that the defense to Brown was provided solely on his connection as corporate officer/shareholder of Allgreen. (*See* Doc. #20, Exh. B at 68; *see also* Doc. #20, Exhs. C, no. 320 and D, no. 969). On August 22, 2008, QBE, on behalf of Allgreen and Brown (under his status as an officer of Allgreen Landscaping), entered into a settlement agreement with the

---

[7] Brown owns all of the stock in Allgreen Landscaping. (*See* Doc. #20, Exh. B at 79).

[8] However, QBE did reserve the right to pursue reimbursement or contribution from EMC for sums paid in defending and settling the underlying action. (*See* Doc. #20, Exh. C).

Walkers and satisfied the settlement in full.[9]   (*See* Doc. #16, Exh. 13; Exh. 7 at 51-

53).  The final court order states:

> The Court has also been advised that the settlement proceeds
> referenced herein are being paid by QBE Insurance Corporation
> on behalf of its insured, Allgreen Landscaping and Lawn Care.
> The Court has been made aware that defendant Jimmie Lee
> Brown also maintained a policy of homeowners insurance with
> EMC Insurance Company and that EMC Insurance Company was
> placed on notice of the claim and suit and has been provided with
> notice that a compromise settlement of the case has been reached.
> The Court has been advised that, as of this time, EMC Insurance
> Company has failed or refused to extend a defense or
> indemnification to Jimmie Lee Brown and that after this
> settlement has been approved, QBE Insurance Corporation has
> reserved its rights to pursue a reimbursement or contribution from
> EMC Insurance Company for sums that it has paid in defending
> and settling this suit.

(Doc. #20, Exh. C at 3).

QBE then filed the current action against EMC seeking to recover the full

amount it paid to defend and settle the underlying action.  (*See generally* Compl.).

---

[9] The Final Court Order approving the settlement agreement acknowledges Brown and
Allgreen as one singular "defendant" in paragraph 6 – "[t]hat this settlement will forever
discharge the defendant, Jimmie Lee Brown, and Allgreen Landscaping and Lawn Care, from all
claims of the plaintiffs and all claims by third parties for any unpaid medical bills, subrogation
interests or liens, both filed and unfiled, arising from the accident made the basis of plaintiffs'
petition."  (*See* Doc. #20, Exh. C).  However, elsewhere the Release refers to "defendants."  (*See
id.*)  ("The defendants deny any liability to the minor plaintiffs;" "the parties have entered into a
proposed compromise settlement of all claims of the plaintiffs against the defendants.").

## IV.   APPLICABLE LAW AND SUBSTANTIVE ANALYSIS

EMC argues that it had no duty to defend or indemnify Brown in his individual capacity for the claims made part of the underlying lawsuit.  As grounds for that argument, EMC states: (1) EMC's homeowner policy is excess to QBE's CGL policy; (2) the Walkers sought no "property damage" as it is defined in the Homeowner's Policy; (3) the Walkers did not allege "bodily injury" caused by an "occurrence" as it is defined in the Homeowner's Policy; (4) certain other Homeowner Policy exclusions; and (5) that QBE cannot meet its burden of proof.  (*See generally* Doc. #16).  QBE responds in its own cross motion for summary judgment that: (1) EMC should be estopped from denying coverage obligations because the language of the Homeowner's Policy issued to Brown is ambiguous and provides only illusory coverage; (2) the underlying incident had nothing to do with the business of Allgreen Landscaping; and (3) the "other insurance" provisions and case law relied upon by EMC are irrelevant because QBE's CGL policy and EMC's Homeowner's Policy are not concurrent policies.  (*See* Doc. #20, Table of Contents).

The arguments boil down to an interpretation of the insurance policies.  Since this is a declaratory judgment action, "if the allegations in the complaint alleging a claim against the insured either are acts not covered by the policy or are excluded from the policy's coverage, the insurer is not obligated to defend or indemnify the

14

insured." *IDC Constr., LLC v. Admiral Ins. Co.*, 339 F. Supp.2d 1342, 1347 (S.D. Fla. 2004) (citations omitted).  A court should grant summary judgment "in a declaratory judgment action seeking a declaration of coverage, when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Id.* (citations omitted).

Further, "[a]n insurance company has the right to limit its liability and write a policy with narrow coverage."   *Turner v. State Farm Fire & Cas. Co.*, 614 So.2d 1029 (Ala. 1993).  But when such limitations create doubt "as to whether an insurance policy provides coverage, the language used by the insurer must be construed liberally for the benefit of the insured and strictly against the insurance company." *Turner v. State Farm Fire & Cas. Co.*, 614 So.2d 1029 (Ala. 1993); *see also Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 (11th Cir. 2002) and *Altiere v. Blue Cross & Blue Shield*, 551 So.2d 290, 292 (Ala. 1989).  "The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide."  *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003).  It is here that the court's analysis of the facts before it begins.

### A.    The Terms of the Homeowner's Policy are Ambiguous

EMC argues that no coverage exists for Brown because the alleged "bodily injury" was not caused by an "occurrence" under EMC's Homeowner Policy.  (*See* Doc. #16 at 13-24).  The Policy provides as follows:

> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an occurrence to which this coverage applies, we will:
>
> 1.    Pay up to our limit of liability for the damages for which the "insured" is legally liable . . .; and
>
> 2.    Provide a defense . . .

(Doc. #16, Exh. 8).  "Bodily injury" is defined by the Policy as meaning "bodily harm, sickness, or disease, including required care, loss of services and death that results."  (Doc. #20, Exh. E at 1).  For an additional premium, Brown purchased the Personal Injury Endorsement to the Policy, which enlarged the definition of "bodily injury" to include "personal injury."  The definition of "personal injury" in that Endorsement means "injury arising out of," *inter alia*, "false arrest, detention, or imprisonment, or malicious prosecution."  (Doc. #20, Exh. L).  An "occurrence" is defined as:

> an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

      a.      "Bodily injury;" or

      b.      "Property damage."

(Doc. #20, Exh. E at 1).

The crux of EMC's argument is that, because Brown's conduct was intentional,[10] it necessarily does not fall into the category of an "accident" as required by the Policy in order for coverage to attach for bodily/personal injury.[11]  The court agrees that, by common definition, intentional conduct cannot be accidental.  But the problem for EMC is that the Policy Endorsement that Brown purchased specifically defines personal injury as, *inter alia*, false detention.  By its common definition, false detention *requires* intentional conduct.  *See Cannon v. Macon County*, 1 F.3d 1558, 1563 n. 3 (11th Cir. 1993) (setting out the elements of common law false imprisonment as: (1) intent to confine; (2) acts resulting in confinement; and (3) consciousness of the victim of confinement or resulting harm); *see also* Restatement (Second) of Torts §35 (1965) ("An actor is subject to liability to another for false

---

[10] The parties do not dispute that the conduct of Brown was intentional.  (*See* Doc. #16 at 15-17 ("Brown's alleged actions made the basis of the underlying action are affirmative, deliberate acts and ***do not constitute an accident***.  The QBE corporate representative also agreed that those acts, the conduct that Brown was accused of, were deliberate.") (emphasis in original); *see also* Doc. #20 at 12 ("EMC commits a substantial portion of its brief to emphasizing its point that Brown's conduct was deliberate and intentional.  QBE agrees.")).

[11] There is no dispute that the Walkers, in the underlying lawsuit, sought no "property damage" as defined by the Homeowner's Policy.  (*See* Doc. #16 at 13-14).

imprisonment if . . . he acts intending to confine the other . . .").  Thus the Policy directly contradicts itself.[12]

This is not the first time a court sitting in Alabama has come to the conclusion that a policy, covering only "accidental" occurrences but also false detention is contradictory.[13]  In *Titan Indem. Co. v. Riley*, the policy at issue provided coverage for the intentional act of false imprisonment, yet also contained a provision that coverage only extended to "personal injury the insured did not expect or intend." 641 So.2d 766, 768 (Ala. 1994).  The Supreme Court of Alabama highlighted that conflict:

> The language of the policy does preclude coverage for intentional acts, but it also specifically provides coverage for acts of malicious prosecution, assault and battery, wrongful entry, piracy, and other offenses that require proof of intent . . . The conflict between these provisions creates an inherent ambiguity within the policy . . .

*Id.* at 768.  Five years later, the same issue was reviewed by the Northern District of Alabama.  In *Titan Indem. Co. v. Newton*, the defendants contended that the policy

---

[12] The Court notes that the Policy is not ambiguous merely because the parties dispute its construction.  *See Woodall v. Alfa Mutual Ins. Co.*, 658 So.2d 369, 371 (Ala. 1995) ("[T]he fact that different parties contend for different construction does not mean that the disputed language is ambiguous.") (*quoting Gregory v. Western World Ins. Co.*, 481 So.2d 878, 881 (Ala. 1985)).

[13] In addition to the ambiguity doctrine, (*see* discussion *infra*), the corollary "illusory coverage" doctrine also applies to defeat EMC's no "occurrence" argument.  Under Alabama law, "insurance contracts must be interpreted to avoid illusory coverage, which occurs when a limitation or exclusion completely contradicts a coverage provision."  *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254 (11th Cir. 2007).

was ambiguous because it excluded coverage for intentional acts on one hand, but permitted for intentional act recovery on the other.[14]  39 F. Supp.2d 1336, 1344 (N.D. Ala. 1999).  The court held, once again, that "[t]he conflict between these provisions creates an inherent ambiguity within the policy . . ."[15]  *Id.*

Because the Homeowner's Policy as written is ambiguous, it is the responsibility of the court to further construe its terms.

### B.     The Ambiguity Dictates that the Policy be Construed in Favor of the Insured

---

[14] Specifically, the policy obligated the insurance company to pay for an "occurrence," defined as an event which results in an unintentional personal or property injury, but then goes on to define personal injury as things such as false arrest, unlawful prosecution, and violations of civil rights, all of which may involve an intentional injury.  *See Newton*, 39 F. Supp.2d at 1344.

[15] Aside from these two Alabama cases, "[a] number of courts have held that an insurance policy that purports to cover certain intentional acts or torts while simultaneously limiting coverage to unintentional or unexpected acts is ambiguous and must be construed against the drafter in favor of coverage."  *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 519 (5th Cir. 2005) (*citing North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983 (6th Cir. 1997) (finding ambiguity when an insurance policy provided coverage for intentional acts of discrimination, yet excluded coverage for acts which did not occur unexpectedly or unintentionally)); *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336 (7th Cir. 1995) (same with respect to intentional torts such as libel, slander, defamation, false arrest, malicious prosecution, and humiliation while simultaneously limiting coverage to unintentional acts); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1045 (7th Cir. 1987) (same with respect to advertising injury); *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 950-51 (4th Cir. 1988) (vacating summary judgment in favor of insurer on grounds that potential ambiguity was raised by apparent conflict between policy's coverage of libel, slander, defamation, and unfair competition, and limitation of coverage to unintentional or unexpected injuries); *Lineberry v. State Farm Fire & Cas. Co.*, 885 F. Supp. 1095, 1099 (M.D. Tenn. 1995) (finding policy ambiguous when it provided coverage for invasion of privacy and then excluded coverage for intentional acts); *Lincoln Nat'l Health & Cas. Co. v. Brown*, 782 F. Supp. 110, 113 (M.D. Ga. 1992) (same with respect to false arrest, malicious prosecution, and assault and battery).

It is well settled in Alabama that insurance contracts are to be considered "liberally in favor of the insured and strictly against the insurer." *See Allstate Ins. Co. v. Skelton*, 675 So.2d 377, 379 (Ala. 1996). Moreover,

> An insurance policy is written by the insurance company. Most insureds depend upon the company to provide the coverage they seek. When doubt exists whether coverage is provided, the language used by the insurer must be construed for the benefit of the insured. Likewise, where ambiguity exists in the language of an exclusion, the exclusion will be construed narrowly so as to limit the exclusion to the narrowest application reasonable under the wording.

*Titan Indem. Co. v. Newton*, 39 F. Supp.2d 1336, 1344 (N.D. Ala. 1999) (internal citations omitted). Moreover, the ambiguity in the contract triggers the reasonable expectations doctrine. That doctrine dictates that, when provisions of an insurance contract are subject to two interpretations, one favorable to the insured and one favorable to the insurer, 'the construction favorable to the insured shall prevail." *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293 (Ala. 1999).

Therefore, because the Policy in question is ambiguous on its face, it must be construed against EMC and in favor of the insured, Jimmie Lee Brown. As such, EMC owed Brown the duty to defend the underlying lawsuit, as well as the duty to indemnify QBE against the loss *if, and only if,* no Homeowner's Policy exclusions are applicable to the facts as presented in the underlying lawsuit. That is the next inquiry before this court.

**C.    The Homeowner's Policy Exclusions**

    **1.    EMC's Homeowner's Policy is not excess to QBE's CGL policy.**

EMC argues that, assuming the Homeowner's Policy applies to the underlying action, (*see* Doc. #23 at 1), its coverage is excess to QBE's policy because QBE provides "other valid and collectible insurance" to Brown as referenced by the following provision in the EMC Homeowner's Policy:

> 8.    Other Insurance – Coverage E – Personal Liability.  This insurance is excess over other valid and collectible insurance except insurance written specifically to cover excess over the limits of liability that apply in this policy.

(Doc. #16, Exh. 8 at 17).  In comparison, QBE's "other insurance" provision reads as follows:

> 4.    Other insurance
> If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of the coverage Part, our obligations are limited as follows:
> a.    **Primary insurance**
>     **This insurance is primary except** when b. applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below.
> b.    Excess insurance
>     This insurance is excess over:
>     (1)    Any of the other insurance, whether primary, excess, contingent, or on any other basis:

(a)     That is, Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b)     That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c)     That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you[] with permission of the owner; or

(d)     If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury and Property Damage Liability.

(2)   Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement . . .

(Doc. #16, Exh. 10).  Both policies clearly state their coverage – QBE is a CGL policy, while EMC is a Homeowner's Policy.  "Whereas personal liability insurance policies are intended to protect the insured against the risks which are associated with the 'personal' aspects of the insured's life, commercial general liability policies are designed to protect the insured from losses arising out of business operations."  *Couch on Insurance* §129.1.

Under Alabama law, "[t]he determination of which insurance coverage is primary and which, if any, is secondary is dependent upon the exact language of each policy."  *Blackburn v. Fid. & Deposit Co. of Maryland*, 667 So.2d 661 (Ala. 1995)

(*quoting Isler v. Federated Guar. Mut. Ins. Co.*, 567 So.2d 1264, 1265 (Ala. 1990)). The Alabama Supreme Court has made clear that "other insurance" clauses serve the purpose of limiting the insurance company's liability "when a person is insured under two or more policies *covering the same risks*." *Id.* (emphasis in original); *see also St. Paul Fire & Marine Ins. Co. v. Valley Forge Ins. Co.*, 2009 WL 789612, No. 1:06-cv-2074-JOF at *7 (N.D. Ga. March 23, 2009) (*citing Appleman on Insurance*, Allocation Among Insurers § 145.4).  Thus, the "other insurance" clauses cited by EMC are not relevant to the question of coverage that is currently before this court. There are two different insureds that are insured under two different kinds of policies that insure two different risks – QBE is primary as to the business and Brown's connection with it,[16] whereas EMC is primary as to Brown's personal liability.[17]

_____

[16] Under the CGL Coverage Part, Section II – WHO IS AN INSURED, the policy reads as follows:

> 1.  If you are designated in the Declarations as:
>
> d.  An organization other than a partnership, joint venture or limited liability company you are an insured.  Your "executive officers" and directors are insureds, but only with respect to their duties as officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.

(Doc.#20, Exh. D at 7, QBE 000969).

[17] EMC's Policy, via the "Personal Injury" Endorsement, specifically provides personal liability coverage for Brown for the intentional tort of false imprisonment.  *See* discussion *supra*, Section IV.A. and B.

Therefore, this exclusion does not apply, but there is one more to consider – the business connection exclusion.

>   **2.      The business exclusion applies because the underlying incident arose out of or in connection with a business.**[18]

The Homeowner's Policy precludes personal injury insurance for "injury arising out of or in connection with a business."  (Doc. #20, Exh. L).  In its entirety, the exclusion reads as follows:

> Section II      Exclusions do not apply to personal injury.
>
> Personal injury insurance does not apply to:
>
> 4.      Injury arising out of or in connection with a "business" engaged in by an "insured."  This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed or implied to be provided because of the nature of the business.[19]

The Policy itself defines "business" to include "trade, profession, or occupation."

(Doc. #20, Exh. E at 1, ¶ 2).  The Alabama Supreme Court defines a business as

---

[18] It is interesting to note that QBE provided a defense in the underlying action under the personal injury provision which applies to "personal and advertising injury caused by an offense arising out of your business . . ."  (Doc. #16, Exh. 10 at 000967).  In making the determination that coverage existed under the commercial liability policy, the QBE representative testified "it was our opinion that the allegations were covered because the coverage includes false imprisonment or detention or injuries that are a result of that."  (Doc. #16, Exh. 7 at 93-94).

[19] QBE argues that the second sentence of the exclusion is applicable to the question before this court.  (*See* Doc. #27 at 11).  If the phrase "but is not limited to" were excluded, the court would agree.  But the court is not at liberty to ignore the clear language of the contract provision.

embracing "anything about which a person may be busy, and in its usual sense, signifies an undertaking or calling for gain, profit, advantage, or livelihood." *Vallas v. Cincinnati Ins. Co.*, 624 So.2d 568, 571 (Ala. 1993).   But the real question presented by this case is whether the underlying injury as alleged in the complaint "arose out of" or "in connection with" the business.[20]  "Arising out of" language is broad – in fact, it is "about as general and broad as it could be written." *State Farm Fire & Cas. Co. v. Erwin*, 393 So.2d 996 (Ala. 1981) (*citing State Auto. Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 456 F.2d 238, 239 (6th Cir. 1972)).  "Courts have consistently held that but-for causation is enough to constitute 'arising out of.'" *Twin City Fire Ins. Co., Inc. et al. v. Ohio Casualty Ins. Co., Inc.*, 480 F.3d 1254, 1264 (11th Cir. 2007) (internal citations omitted).  But exclusions in general are to be read

---

[20] The case cited by EMC for the definition of "arising out of" actually interprets the stricter phrase of "arising out of the use." *See Taliaferro v. Progressive Speciality Ins. Co.*, 821 So.2d 976, 980 (Ala. 2001).  The Court reasoned:

> "The term 'arising out of the use' in liability policies has generally been held to be a broad, comprehensive term meaning 'origination from,' 'having its origin in,' 'growing out,' or 'flowing from.' " *Travelers Ins. Co.*, 491 S.W.2d at 365.  "The term 'use' ... has been a general catch-all term construed by the courts to include all proper uses of a vehicle." *Id.* "The transportation of firearms is an ordinary and customary use of a motor vehicle, especially pickup trucks." *State Capital Ins. Co.*, 318 N.C. at 540, 350 S.E.2d at 69. "Coverage exists where the minimal causal connection between the use of the vehicle and the injury is provided by the foreseeable and reasonable use of the vehicle for hunting." *Garrison*, 258 Kan. at 551-52, 907 P.2d at 895.

narrowly, and the burden of proof rests on EMC to prove any applicability of the business pursuits exclusion.  *See Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1263 (11th Cir. 2007) ("[I]n Alabama exceptions to coverage are to be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and clauses setting out exceptions must be construed most strongly against the company that issued the policy.") (internal citations omitted); *see also Universal Underwriters Ins. Co. v. Stokes Chevrolet*, 990 F.2d 598, 604 (11th Cir. 1993) ("Under Alabama law, the insurer bears the burden of proving the applicability of any policy exclusion.") (internal citations omitted).  EMC has without question satisfied its burden.

The evidence establishes the following:

- At approximately a quarter to six in the evening, after Allgreen Landscaping was closed, Brown noticed Peyton and Jacob Walker who were "out flying their [toy] rocket and it flew across my [Allgreen Landscaping] building." (Brown Dep. at 50-51).

- Brown asked the boys what they were doing on the property because "it was dark and we [were] closed and they said that they [were] flying their rocket and it accidentally flew over my building and they was out to get it, came out on the property to get it."  (*Id.* at 52).

- Brown then asked the boys if their parents were home, and when the boys responded that the parents were not home "I said well, you come out and what I want you to do, I'm

going to carry you into the nursery, we're going into the nursery, I want to take your name, your phone number, and your mother's and father's names down." (*Id.* at 53). "I was really contacting their parents and letting them know that they was there where they could come pick them up." (*Id.* at 55). "I told them, I said well, if your parents are not at home where I can call them and let them know where you are, the only other choice I had was to call the sheriff and have him to come out and pick them up and carry them home and talk to the patents and let them know what they was doing." (*Id.* at 55-56).

- The sheriff came and told Brown that he should let the children go. (*Id.* at 56-57, 66). Brown's daughter, a police officer, told Brown to let the children go. (*Id.* at 58).

- When asked why he didn't let the boys go after the sheriff told him to, Brown responded: "I had been lied to so many times about all the other incidents;" "I went to the parents' house several times. I never got any help;" "Now rockets flying across my building and you've got buildings burning down from day to day;" "I knew something was going to eventually happen very drastic if me and the parents didn't sit down and try to bring it all to a boil. If that rocket carrying fire had set that building on fire and burned it down, do you think anybody would have come forward?"; "I thought I was doing the right thing. Their parents was not at home. I wanted them to be in some authority's hands." (*Id.* at 67-69, 72-73).

  > Q:   All right, so you didn't hold the boys, then, because somebody lied to you, then, did you?
  > A:   I held the boys for their safety.

  (*Id.* at 70).

- When asked why he brought the children into the building, Brown responded: "I didn't know anything to do but to

make sure that those kids were secured;" "It was dark. We've got retaining ponds on that property. I've got wires out there that's two hundred forty volts that's supplying electricity to that pump. Those kids could have been hurt." (*Id.* at 60-61).

•   Brown did not know if the boys had done any damage to his property at the time he detained them. (*Id.* at 64). In fact, Brown said the boys did "no more than what they told me about the rocket flying over my building." (*Id.* at 65).

This uncontradicted evidence demonstrates that Brown had business motives for bringing the boys into the Allgreen Landscaping building – he didn't want them to get hurt *on his business property*[21] and various incidents of vandalism had occurred on his business property that he believed these same children were involved in. Brown was motivated by his considerations of the profitability of the business, and no reasonable trier of fact could find otherwise. *See State Farm Fire & Cas. Co. v. Burkhardt*, 96 F. Supp.2d 1343, 1350 (M.D. Ala. 2000) (finding business pursuits clause inapplicable where "none of the alleged conduct . . . were actions which were related to or in furtherance of business pursuits . . ."). Therefore, the business pursuits exclusion applies – EMC owed Brown no defense, and QBE no indemnification, in the underlying action.

---

[21] There is no indication that Brown would have been concerned for the safety of these children had he seen them, for example, flying a toy rocket on the streets of downtown Birmingham without parental supervision.

## V.    CONCLUSION

Although EMC's policy is ambiguous and theoretically supplies coverage to Brown for his action of detaining the Walker boys, the interpretation of the "business pursuits" policy exclusion clearly forecloses any responsibility of EMC to indemnify QBE for its defense and settlement of the underlying lawsuit.  Therefore, Employer Mutual Casualty Company's Motion for Summary Judgment (Doc. #15) is due to be granted and Petitioner QBE Insurance Corporation's Cross Motion for Summary Judgment (Doc. #19) is due to be denied.  A separate order will be entered.

**DONE** this the   23rd   day of February, 2010.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE